IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

---

SHARON K. WALKER                                      PLAINTIFF

VS.                           CASE NO.: 4:15-CV-00695-SWW

PULASKI COUNTY SPECIAL SCHOOL DISTRICT,
A Public Body Corporate                               DEFENDANT

---

ORAL DEPOSITION OF SHARON K. WALKER

December 15, 2016

---

CC☐Y

BUSHMAN COURT REPORTING
620 West Third, Suite 302
Little Rock, Arkansas  72201
501.372.5115

if I did keyboarding or I was doing a math, and so they were on the computer.

Q.    Okay.

A.    And they just did that.  So I wanted to be in a regular school environment that offered, you know, the traditional school.

Q.    So were you at the Little Rock's ALE campus or ALE building?

A.    Yes, but it was in east -- is it East End?

Q.    East End, the community?

A.    Uh-huh, the old.

Q.    East End, is that, that's like near Sheridan?

MR. PORTER:  Are you talking about Carver, East End, Little Rock?

MR. KEES:  Okay.

THE WITNESS:  Yeah.

MR. KEES:  Oh, that way?

MR. PORTER:  East Little Rock.

MR. KEES:  Gotcha.

BY MR. KEES:

Q.    So let's talk about PCSSD.  What was the first job you took there?

A.    At Mills.

Q.    How long were you at Mills?

A.    Until I went to Maumelle.  I don't know,

maybe...

Q.    How long were you at Maumelle?

A.    I don't even recall when they opened.  I apologize.

Q.    Okay.  I don't know either.

A.    I mean, it's just part of the county.  I don't...

Q.    Well, let me ask this.  I know you were there the 2014-2015 school year?

A.    Uh-huh.

Q.    That's when you went on leave.  Had you been there a year prior?

A.    Yes.  I was there when they opened Maumelle.

Q.    Okay.

A.    I transferred there.  I apologize.

Q.    That's fine.  I probably should know that, but I don't know it offhand.  What was the reason for going to Maumelle?

A.    At Mills the enrollment dropped, and so I had less seniority, and I went to ALE at the County, and they were closing or phasing out the ALE, and --

Q.    At Mills?

A.    No, at the County, Pulaski County.

Q.    Okay.

A.    So I went to Maumelle High.

Q.    it Hallen or Holland?  How are you saying it, Hallen?

A.    Hallen.

Q.    Hallen, is that in West Little Rock, the gated community?

A.    Yes.

Q.    Okay.  I know folks that live out there.  Okay. So Maumelle, and where else -- in and around 2011?

A.    Yes.

Q.    Fall of 2011?

A.    I was teaching Algebra II, and, actually, I guess, from -- I moved there September/October when they decided to, I guess, close the ALE.  So I taught Algebra II from September through December.

Q.    Of 2011?

A.    Yes.  And in January I was in an accident, so I was off the remaining of the year.

Q.    So through, roughly, July?

A.    Yes, that's correct.

Q.    An automobile accident?

A.    Yes.

Q.    Were you injured?  Obviously you were injured?

A.    Yes.

Q.    Did you have to have surgery?

A.    No.

Q.    So did you take your FMLA leave?

A.    We did, uh-huh.

Q.    Okay.  So then the 2013-2014 school year, what was that coursework looking like?

A.    It was economics, Business Law I and II.  I got assigned to -- was that the year I came out?  I can't remember.  Was that my --

Q.    No.  No, the year that you took leave was '14-'15?

A.    Okay.  So business law, economics, Business Law I and II, and then Ms. Guthrie (phonetic) said I was short one class period, and I had seniority.  I could bump another teacher for one class, or I could go to the in-school and relieve the in-school teacher, so I did that.

Q.    What did that -- what did you do in the in-school?

A.    Sat there with the students that were in in-school.

Q.    And these are students -- that is not ALE?

A.    Huh-uh.

Q.    Because it's not there long term.  So you would essentially help them if they had a question about their coursework?

A.    Yeah, but they never had a question.

Q.    That's probably why they are in in-school?  I

A.    The second period they gave me ALE.

Q.    Okay.

A.    And I didn't get my schedule like normally late April, early -- well, May they do your schedule, and, I mean, it has been traditionally up until the last two years that I worked for the County you would know your class, what you're teaching the following year.

        This particular year on this schedule it was three or four other teachers and myself.  The board was not complete, so I went to a training July there at Maumelle High School, late July.

Q.    Of 2014?

A.    Uh-huh, early August.  I can't remember the date.  But when I logged in the computer, we were doing some kind of computer training, and I found my schedule.  But second period, it wasn't -- I never had a conversation with Ms. Ireland about teaching a college class --

Q.    Okay.

A.    -- or anything about math.  And it was the ALE that was housed -- they moved them in the school.  They had me teaching Algebra I, Algebra II, and geometry.  And they had a fourth math on there during a 50-minute block period.

        It's also my economics and Business Law I

and II. So Ms. Guthrie stated that there was no grading of papers or doing any work. It was computer-based, but they had no computers to work with.

Q. What are we talking about, Algebra I?

A. Well, all of it. It was Algebra I, II, geometry. There were no books. I had to try to find coursework. I had to grade papers, as well as do the economics and Business Law I and II.

Q. Okay. Let's see this back.

A. So that's just incorrect.

Q. So what was -- what do you recall it being?

A. Well, we never had a conversation about me teaching math for starters. I didn't even know until I went to the training about that math.

Q. Okay. When do you recall getting your schedule?

A. They never sent me anything. I went to a training there at the school, like I said --

Q. In the summer of 2014?

A. When -- yeah, right there.

Q. Prior to 2014 school year?

A. Uh-huh. It was, I want to say, July or August. It was right before school started, and -- I just -- that schedule -- I mean, I guess --

Q.    Well, that's why I pulled it back because it's my notes, so.

A.    Oh right, I understand, but the conversation, I mean, I had five -- I had five preps I had to do.

Q.    You're talking about preparing for a class?

A.    Yes.

Q.    Okay.

A.    Yes.

Q.    So let me ask this, to the best of your recollection, because you taught -- you were teaching for at least a semester before you went on leave -- well, I think we will go over it, but I think you went on leave in December?

A.    Yes.

Q.    So at least four months.  What do you remember teaching?

A.    I taught economics.  Then I went to the ALE. And I had to teach Algebra I, Algebra II and geometry.  There was no computers in there.  There was no books, no guidance, nothing.

Q.    For Algebra I, Algebra --

A.    Algebra II, and Algebra III.

Q.    Okay.

A.    I mean, no, geometry.  There were three maths during a 50-minute class period.

44

Q.    Well, they were different class periods?

A.    No, no, they were all -- all of them was in one class period, 50 minutes.  All of that in second period.

Q.    Algebra I, II?

A.    And geometry.  It was supposed to have been a computer-based, but the district didn't get the program -- I mean...

Q.    Didn't get the program?

A.    They didn't get it up and running -- I don't think -- until November.  I mean, I can't -- I don't --

Q.    So do you remember teaching business law?

A.    I did.  I went back in third and fourth.  I don't remember which order, but after I left there third period, I had a business law class, or maybe economics.

      And then I had a fourth period business law, economics.  I don't remember the exact schedule, but yes, I taught five preps.

Q.    Okay.  So let's talk about -- and preps is separate from periods; right?  When you say "preps," you're meaning preparing for class?

A.    The class, yes, uh-huh.

Q.    Okay.  So there was going to be one period that

had a combination of Algebra I, II, and geometry?

A.     Uh-huh.

Q.     And did you split the class into, like, 15-minute increments, or was it all taught together in some way?

A.     Well, I didn't have any -- I asked for guidance.  I mean, I got worksheets and tried to split it and work with the students, I mean.

Q.     And did they -- did that period change?

A.     No.

Q.     Okay.  So you had that class for the whole semester?

A.     The entire year, yes.

Q.     The entire year?

A.     Yes.

Q.     But you taught it for the entire semester?

A.     Yes.

Q.     Okay.  So on this that I was showing you, it had business law first period.  Do you think that's accurate?

A.     Uh-huh.

               MR. PORTER:  You need to say "yes."

A.     Yes.  I'm sorry.

Q.     And then it had second period as the Algebra I?

A.     Algebra II, and geometry.

Q.    Okay.

A.    So it wasn't just one.

Q.    All right.  So it was my error on that.  I don't know school like you do.  That was the algebra -- what did you call that class period?

A.    ALE, alternative learning.

Q.    Oh, okay.  So it was ALE, but they --

A.    Housed in the school.

Q.    Gotcha.

A.    Uh-huh.

Q.    And then it's got third period economics?

A.    Yes.

Q.    And then fourth period business law?

A.    Correct.

Q.    Is that the same business law --

A.    Uh-huh.

Q.    -- that you had taught prior?

A.    Uh-huh.

Q.    And was the economics the same that you had taught --

A.    Yes.

Q.    -- previously?  And then it shows fifth period economics again?

A.    Yes.

Q.    And that's the same coursework as your third

49

the school.

So the schools had to keep their ALE there instead of sending them to a central location where all of them -- it was supposed to have been cheaper for the district or whatever.

Q.   So you had all of your classes in the same classroom, except ALE, where you went to the ALE classroom?

A.   That's correct.

Q.   And then third, fourth, fifth, sixth is your conference.  Seventh is another class.  You could stay in your one classroom?

A.   That's correct.

Q.   So is it true the only substantive course change in 2014-15 was the addition of the second period ALE class?

A.   That's correct.

Q.   Now -- and you've said that you were told that there was supposed to be a computer program, and it hadn't arrived?

A.   That's correct.

Q.   Would -- would administering that class on the computers have been better?

A.   I don't think so.  I mean, the students were not on grade level, none of the students.  The

50

behavior issues, it was off the chart.

I was told it would be another teacher with me, but the teacher had -- planning in there with me. The ALE teacher had planning during second period, so I was in there by myself.

And they got a parapro, and then we had a lot of Special Ed students in there, so they had a Special Ed teacher to come, but it was -- it was just wild.

It was -- the behavior was not -- it wasn't a learning environment, conducive to learning. It wasn't an environment conducive to learning because of the behavior issues in there. There was either a fight every day, or profanity, or it was just chaotic.

Q. Now, how many students were in this ALE classroom?

A. Oh, I don't want to tell a story. I want to say maybe 12 or 15, I mean.

Q. Well, I understand maybe you don't -- I was trying to get a good ballpark.

A. Okay.

Q. Would 12 to 15 be accurate?

A. I think so. I don't recall, but it was some serious behavior issues, like fighting.

61

So when she first came, my schedule was already set. So I did all of my economics. At the end of that year, she moved my classroom, and I was like, okay.

Then she called me in and said that, you know, you're one class short. I discussed -- I shared with you about I had the seniority, and you could bump another teacher, go to in-school. So I did the in-school.

Q.   So that was the year prior?

A.   Right. Then she moved my room, and she put me in, like, a little cubbyhole, like this. Well, let me back up.

The first year she was there, I mean, I just started having, like, major, major headaches, and I ended up -- one of the teachers had checked my blood pressure.

It was, like, 180, and I can't remember the bottom number, because I have never had high blood pressure, and they sent me to the nurse.

And the nurse wanted to call the paramedics, and I said, Well, I can drive myself, because I didn't understand the magnitude of blood pressure, because I have never been bothered.

So I went to my doctor -- actually, I went

by my house, and I was taking some apple cider vinegar for weight loss. And so I drank some of that, because I read that that was good for blood pressure, and I went to my doctor, and it was still up, 170-something.

So I didn't have a history of high blood pressure and had no stresses at home, and he said, you know, What's going on? And I told him, Work.

And so he put me on a fluid pill, Triamterene, and he said it would help calm me down and ease my -- so as the year progressed, with Ms. Guthrie moving me, like I said, in the box.

Q. Are we talking about 2013 and '14, the year prior to your leave?

A. Yes, uh-huh.

Q. I didn't mean to interrupt.

A. Oh, no worries.

Q. Were you -- you were finishing a statement there, something about as things continued with Ms. Guthrie?

A. Yes. So, you know, we did like a 30-day trial to see. You know, I went back, and the day I believe I went back, my pressure was sky high.

She had moved me in a room similar to maybe this. It was no SMART Board. It was isolated. It

wasn't close to a restroom.

And my doctor had given me an accommodation letter, and I met with her, was taking a fluid pill. You know, some days you may go to the bathroom 20 times; some days you may go 10.

It just varies. So I needed an accommodation, and I needed to be next to a teacher next door, so whenever I had to go, I could go, instead of waiting for security or whatever.

So I provided my accommodation letter. I talked to her, and I was -- you know, she would just begin moving me around.

And she moved me again down -- I didn't teach ninth graders, but she put me with ninth graders. I was teaching eleventh and twelfth graders.

Q.    Now, going back to this classroom, were you there -- did she move you after you made these, this accommodation known to her?

A.    Well, this right here, my accommodations was prior to that, yes.

Q.    Right.

A.    Yeah, so she was still moving me and doing stuff to me. That's why I said it was retaliatory.

Q.    Well, when you were in this classroom, that was

64

not close to a bathroom?

A.    I didn't go because she said, Well, someone has to go.  If you're not going to go, who is going to go?  I don't know.

Q.    Go where?

A.    In that room, but no one went in the room.  I'm the only person that she assigned that box to, and she didn't assign it to anyone else.

She didn't email them.  She didn't ask.  I'm the only person.  So she moved me to another classroom.

Q.    So you were actually never in that classroom?

A.    Well, because I appealed it, and I -- you know, there is no -- you are violating my accommodation.  I have to be next to a restroom.  You know, there is no one close by.  If I have to go to the restroom, what am I going to do, use it on myself?

Q.    Well, I'm just saying --

A.    No, that's why --

Q.    -- she never did move you to this classroom we were talking about?

A.    Well, no, because I contacted Dr. Warren then, no.  I mean, no one else was moved or given a box.

Q.    Well, and to be accurate, you were never put in this classroom?  It was suggested that you move

A.    She assigned me the classroom.

Q.    For the next school year?

A.    Right, uh-huh.

Q.    And you, you were never actually located there, though; correct?

A.    No, I did not, because it did not meet my accommodations.

Q.    So is it fair that they did accommodate you in allowing you to stay in the classroom you had?

A.    After much, much stress, yes.

MR. PORTER:    Make sure you let him finish.

A.    Okay.    Yes, after a lot of, you know, stress and anxiety, and she eventually moved.

Q.    She eventually what?

A.    Moved me to a regular, back to a regular classroom.

Q.    Did you actually ever move classrooms, or did you get to stay where you?

A.    I moved classrooms.

Q.    But it was not the one that you were not wanting?

A.    No, I didn't move to that one.    I moved to another one.

Q.    Was the other classroom near a bathroom?

African-American?

A.    Caucasian.

Q.    And all of these acts that we've discussed, you said led to the retaliatory act of Ms. Guthrie assigning you that second period ALE class in 2014-'15?

A.    Well, yes.  And then Dr. Bednar had to come as well.  She had to instruct Ms. Guthrie on my evaluation.  She marked me really poor communication with her, and she instructed her to remove that, and she couldn't do that.

Q.    Again, that's another one of the issues that go back to what your allegations, that this was retaliatory?

A.    Right.

Q.    And you having to do the ALE; correct?

A.    Well, all of it.  You know, she knew I had the accommodation, a disability, but she continued to do stuff to make my blood pressure go up, anxiety, and, you know, she just kept taunting.

Q.    And you said you had a grievance over being assigned the ALE; right?

A.    Yes.

Q.    And you had the level one with Ms. Guthrie, and that was denied?

A.    Uh-huh.

Q.    Who was your level two with?

A.    It was supposed to be Dr. Warren, but for some reason Dr. Guess took it over.  And I asked if -- we went in the initial hearing, and I asked if we could reschedule again from Dr. Warren, and he said he will get back with us.  And he sent a letter, and he continued, he heard it.  He had taken it from -- it was assigned to Dr. Warren, and he had taken over it.

Q.    Did you have a meeting with him?

A.    Yes.

Q.    Was he your AEA rep?

A.    Yes.

Q.    And Dr. Guess upheld --

A.    Of course, yes.

Q.    -- the -- you teaching ALE?

A.    Uh-huh.

Q.    Did you take a level three to the --

A.    Yes.

Q.    -- panel?

A.    It was assigned, but I went off on medical, so I wasn't stable enough to come back.

Q.    So as far as the grievance, you never exhausted all of the grievance remedies; correct?

A.    Well, I went to a level -- it was on the agenda

for a level three.  Before I went off on disability -- well, with my diagnosis, they had some type of hearing, I think a code or something.

So they didn't finish until like one or two in the morning, so the union rep, you know, she was like, oh, it's eleven o'clock, you know, don't worry about it.

And then the next month, I can't recall what happened, but, you know, the meeting -- they had me on the tail end, and so I went off of work, and I never did get a chance...

Q.    So you were still at work, on duty, I'm going to say, when you were on the first board meeting?

A.    Yes.

Q.    But it wasn't heard because -- what's the reasoning again?

A.    I believe they had a teacher that pushed her student.  Something went on like for hours.

Q.    Okay.

A.    Over into the wee hours in the morning, and so the -- Sandy Rory (phonetic) just texted me and told me don't worry about coming.  She was going to text me when to head that way.

Q.    So Ms. Rory, your representative, told you not to come to the meeting, and then the next meeting you

A.    Uh-huh.

Q.    Okay.  Besides the high blood pressure and just irregular colds, that kind of thing, any other health issues prior to September of 2014?

A.    I had some female issues but nothing.

Q.    When did you start treating with Dr. Patricia Griffin?

A.    February of 2015.

Q.    So September of 2014 you told me that's when this anxiety, worry, sleeplessness issue started occurring; correct?

A.    Uh-huh, OCD.

Q.    And OCD?

A.    Uh-huh.

Q.    And it's your testimony that you had never had those issues prior to --

A.    No.

Q.    -- September of 2014?

A.    No.

Q.    No?

A.    No.

Q.    Any other life events taking place around September of 2014?

A.    No.

Q.    Okay.  And then let's go over your leave, and

Q.    Do you think she was doing that at Ms. Guthrie's direction?

A.    I don't know. I had Ms. Ireland's daughter in my class, and her group didn't do a project. And so if you don't do the project, you receive a zero.

And I think her daughter had a 78 or 80 at interim. So Ms. Ireland had Ms. Rice to call me in regarding the grade.

Q.    Who is Ms. Rice?

A.    She was assistant principal, and then --

Q.    While Ms. Ireland was acting principal?

A.    No, no, no. While Ms. Guthrie was principal.

Q.    Okay.

A.    And then Ms. Guthrie called me in, and they wanted me to change the grade, but it wouldn't be fair to the other four that were in the group.

And so they ended up taking her daughter out of my class. I think it was maybe three weeks left into the semester.

Q.    But during the time that Ms. Ireland was assistant principal, will you admit that she was not the decision maker regarding --

A.    Yeah, she did a lot of decision making. She did.

Q.    In regards -- but not in regards to the mailbox

that?

A.    Well, he said they would have some openings. You know, people retire at the end of year, and then I could move to a business if there is an opening.

Q.    Now, you were wanting to stay at Maumelle?

A.    No, no, no.  No, no.

Q.    You didn't have a preference?

A.    No.  No.  Anywhere, just in the district.

Q.    Okay.  And then at some point he talked to you about the job at Jacksonville North Pulaski School?

A.    Well, after they filled all the -- you know, Keys (phonetic) had stated that at the end of that year --

Q.    Dr. Key?

A.    I didn't know he was a doctor.

Q.    Oh, okay.  Mr. Key.

A.    Yeah.

Q.    But you're talking about Johnny Key, the commissioner?

A.    Yes, uh-huh.

Q.    Okay.

A.    So, anyway, they had stated that -- he had stated that at the end of the year that the people in Jacksonville would no longer have a job, so --

Q.    At the end of the 2016, or end of 2015-'16

school year?

A.    Right, correct.

Q.    Okay.  Go ahead.

A.    And so I had interviewed for a job, I believe, at Mills.  I applied for Mills, Sylvan Hills.  I wasn't afforded an interview at Sylvan Hills.  I don't know why, but anyway, --

Q.    What is the timeframe on these when you're applying?

A.    Whenever they --

Q.    Around, can we say around the spring of 2015?

A.    No.  It was --

Q.    The end of -- oh, it would have been the end of --

A.    The school year.

Q.    Yeah, around the spring of 2015?

A.    Uh-huh.

Q.    Like April, May, sometime?

A.    No, no.  They were like in June.

Q.    June of 2015?

A.    Uh-huh.

Q.    Okay.  Hold on.

A.    So Dr. Griffin had sent him a letter and stated that I was, I could return in a business position.

Q.    So where did you apply?

A.    They had Mills, Sylvan Hills, Robinson Middle School, North Pulaski.  I didn't apply there.  And I think there was another school in district.  I can't recall.

Q.    Now, the Mills position, what happened there?

A.    I didn't get it.

Q.    Did you interview?

A.    Yes.

Q.    Do you know who did get it?

A.    A lady from Lonoke.

Q.    Do you know her name?

A.    Well, I'm sure if you -- she moved to Maumelle to the position that I previously had, from my understanding.

Q.    So at Sylvan Hills, what happened there?

A.    They didn't even afford me an interview.  Didn't call me.

Q.    Robinson?

A.    I had an interview.

Q.    And you weren't given the job?

A.    No, I wasn't.

Q.    Offered the job?

A.    No.

Q.    Do you know who did?

A.    No, I don't.

105

Q.    And then North Pulaski?

A.    I didn't apply for that, so after they closed all of the schools in the County that wouldn't be affected by the separation.

      Then that's when he sent me an email and told me, Well, I'll going to place you -- he called me, and then he followed up, I believe, with a -- I followed up one of the emails -- I followed up where the email that I'm going to place you -- I found you a job, North Pulaski. But that's not giving me a job, because it's only for nine months.

Q.    Well, did you have any reason to believe that you would not be renewed after the detachment?

A.    They had said that on the news. It was very clear.

Q.    Well, they had to have teachers, though; did they not?

A.    But that's in Jacksonville, that's a whole new district. I mean, I'm giving up seniority, less pay, and driving to Jacksonville. So it wasn't a whole -- and I wasn't guaranteed a job. All of those teachers had to apply.

Q.    To the new Jacksonville North Pulaski School District?

A.    Yes.

Q.    Okay.  And then let's go to this email with the blank at the top.  It looks like you've told Mr. Brewer on -- right there -- on August 3rd that your medical leave has been extended through September 3rd?

A.    Uh-huh.

Q.    Now -- and you agree that's into the next school year?

A.    Uh-huh.

Q.    So is it correct that even if you had had a job at one of these other schools within the district that you spoke of, you still were going to be on leave?

A.    I guess.  I mean, I mean during that time that stressful situation, because when I talked to Mr. Brewer, he led me to believe that once a business position came open that he would transfer me over into -- like they had done previously when I left Mills.  I just went straight over to the ALC.

I picked a school that they had openings, and I chose one, and I just went over there.  So there wasn't any interviews or anything.  I just went to that position.

So when we talked, and he stated that well, business position, then I would, you know, be moved

108

insurance, maintain?  And so, no, that, that was a recipe for a heart attack right there.

Q.    Now, did you ever discuss staying at Maumelle and having to keep your past courses?

A.    No.

Q.    You didn't make that request?

A.    No.  I mean -- no.  Are you talking about keep business?

Q.    I am saying go back to Maumelle with the same classes, except for that one period?

A.    No, they never offered me that.  They gave me three Algebra I class, double block, where most teachers teach 50 minutes per day with students, 250 per minutes per week, they gave me a hundred minutes per day with each student, 500 minutes, so that was double.

Q.    That's what they offered you back at Maumelle --

A.    Yes.

Q.    -- because --

A.    They had taken me all of the way out of business and put me in math.  And they gave me, like, the students that failed Algebra I, double block.

Q.    And this was a conversation that you had with who that told you about this offer at Maumelle?

A.    Well, I kept emailing about my schedule in May, and so in June Mr. Brewer, I believe it was him or Ms. Ireland, they gave me all Algebra I classes, double block.

Q.    And you are licensed to teach those classes; correct?

A.    Yes, but it was too stressful.  I mean, the impact was...

Q.    And then this next one is a letter that you're familiar with.  At the end here, Mr. Brewer, does he state, If your doctor says September 3rd, 2015, that you're medically able to work, and you desire to return to work, let me know right away.  I will do my best to find and offer you a position with PCSSD?

A.    Where are you?

Q.    Right there at the bottom paragraph.

A.    Uh-huh.  Well, that's North Pulaski, so that, that wasn't a job.

Q.    Well, I think you're parsing words here, because at that point North Pulaski High School was still part of PCSSD?

A.    It was, but it was only -- even my doctor and Dr. Griffin, I mean, it was too much stress and worry with me counting down every month that, okay, I have eight months left with a job.  I have five, 30 days.

110

So the anxiety would really have been off the chart.

Q.    So the anxiety wasn't just having to teach algebra and geometry.  It was also the thought of your not being guaranteed employment at Jacksonville?

A.    The job in Jacksonville was a business position, but it was only for nine months, and then I wouldn't have a job.  I would --

Q.    Well, you can't say that with certainly, though; correct?

A.    I did because he couldn't assure that me that they would hire me.  I don't know why they didn't provide my email because I emailed them and said, Are you going to bring me back in the district, you know, if I accept this job?  And he said, Well, I will afford you an interview.

Well, I had an interview with Mills and Robinson, and I didn't get a job.  So, you know, I need to know if I am going to have a job, because, I mean, I started stressing if I go there.  What am I going to do for a job, because I only had nine months to work?

Q.    All right.  And the last letter is a letter from your physician, correct, that you sent to -- that was sent to Mr. Brewer?

A.    Uh-huh.

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

SHARON K. WALKER                                                          PLAINTIFF

VS.                               CASE NO. 4:15-CV-00695 SWW

PULASKI COUNTY SPECIAL SCHOOL DISTRICT,
A Public Body Corporate                                                  DEFENDANT

AFFIDAVIT OF SHARON K. WALKER

Comes the affiant Sharon K. Walker, submitting the following affidavit under oath:

1.      I am currently teaching in the North Little Rock School District.

2.      I was employed by the North Little Rock School District during the 2015-2016 school year, having been employed in February 2016.

3.      I was formerly employed by the Pulaski County Special School District (PCSSD).

4.      During December 2014, I was forced to go out on Family Medical and Leave Act (FMLA), due to my disability due to mental reasons.

5.      During the Summer 2015, I requested reasonable accommodations from the PCSSD, to be allowed to teach my regular business education classes.

6.      During the Summer of 2014, I found out that I was being required by my Principal Rebecca Guthrie that I had to teach my business education classes, on top of having to teach three (3) math classes during the Alternative Learning Education class.

7.      The above mentioned scheduled was in violation of the collective bargaining agreement between the Pulaski Association of Classroom Teachers and the Pulaski County Special School District.

8.      Despite this violation of the collective bargaining agreement, and against the sake of my health, I taught this schedule that was forced upon me, during the Fall of 2014.

9.      The above mentioned schedule caused me to have five (5) preps.

10.     The PCSSD placed a double blocked schedule on me for the 2015-2016 school year, meaning that I had classes consisting of 100 minutes per day, 500 minutes per week, when the normal load for a teacher was 50 minutes per day, 250 minutes per week.

11.     Due to tremendous workload that was being placed on me, I was diagnosed with the condition of severe depression, obsessive compulsive disorder (OCD), and anxiety.  My

1


PLAINTIFF'S EXHIBIT
B

medical condition interfered with my ability to sleep and work, which led me to having to go out on FMLA starting December 30, 2014.

12.    With my disability in mind, my doctors -- Patricia Griffen, Ph.D., and Lee Nayles, M. D., requested on June 10, 2015, that the PCSSD afford me with reasonable accommodations by allowing me to teach my normal business education classes.

13.    The PCSSD responded by offering me a job with the North Pulaski/Jacksonville School District, that was being detached from the PCSSD starting in 2016-2017 school year.

14.    During June 2015, there were three (3) business education classes that were vacant within the PCSSD: Mills, Robinson Middle, and Sylvan Hills Middle.

15.    I applied for the above mentioned jobs.

16.    Furthermore, before these jobs opened, Paul Brewer, the CEO for the Pulaski County Special School District, had promised me that the district would place me in one of the vacant business education classes due to teachers retiring or leaving the district.

17.    I applied for the above mentioned jobs at Mills, Robinson, and Sylvan Hills.

18.    I was granted interviews with Mills and Robinson, but I was not granted an interview with Sylvan Hills.

19.    To my knowledge, the Pulaski County Special School District hired outside applicants for all three (3) positions, two (2) Caucasian and one African-American.

20.    I was never offered any of the business education positions at Mills, Robinson, or Sylvan Hills.

21.    Had the PCSSD offered me one of the business education classes or assigned me to one of the business education classes, that were vacant, I would have readily accepted the offer.

22.    I was hoping that the PCSSD would have assigned me to one of the vacant business education classes, but it chose not to do so.

23.    I did not resign from the PCSSD. In that I was never offered the business education classes at Sylvan Hills, Mills, and Robinson, I interpreted that the PCSSD no longer desired to employ me; therefore, I was terminated.

24.    I am currently enrolled at Arkansas State University (ASU), pursuing my MSE in Special Education.

25.    I receive services through ASU's disability services, due to my recognized OCD, anxiety, and depression. (**See Exhibit "A"**).

26.    The North Little Rock School District also affords me accommodations based on my disability.

2

This statement is true and correct to the best of my knowledge, records, information and belief.

Sharon K. Walker

STATE OF ARKANSAS )
                         ) ss.
COUNTY OF PULASKI )

SUBSCRIBED and SWORN to before me, a Notary Public, on this 13th day of March 2017.

NOTARY PUBLIC

MY COMMISSION EXPIRES:

May 15, 2018

LONNETTE M. DAVIS
COMM. #12365960
Notary Public · Arkansas
Pulaski County
My Comm. Expires May 15, 2018

3

**COMPOSE**

↰ Reply   ↞ Reply All   ➜ Forward   🗑 Delete   ⊖ Spam   More ▾

Search Mail

**Fwd: [DServices] Sharon Walker - ELSE 6163.10A - POSITIVE BEHAVIOR INTERVENTION (CRN: 1:**

**Sharon Walker** to you    show details

Today on AOL

| | |
|---|---|
| Inbox | 14172 |
| Drafts | 35 |
| Sent | |
| Spam | 125 |
| Trash | |
| Contacts | |
| Calendar | |
| My Folders | |
| Saved Mail | |
| Saved Chats | |
| Notes | 2 |
| Pleading | 1 |
| Sent Items | |

---------- Forwarded message ----------
From: **dservices@astate.edu** <dservices@astate.edu>
Date: Friday, January 20, 2017
Subject: [DServices] Sharon Walker - ELSE 6163.10A - POSITIVE BEHAVIOR INTERVENTION (CRN: 13779) - Notification of DSe
To: Sharon Walker <sharon.walker1@smail.astate.edu>

**Accommodations Notification**

**A-STATE**
**Office of Disability Services**

**Important Notice**: The information in this letter is strictly confidential!

To: **Kimberley Davis - Spring 2017 - ELSE 6163.10A - POSITIVE BEHAVIOR INTERVENTION (CRN: 13779)**
From: Dr. Jenifer Rice-Mason, Director of A-STATE Disability Services
Date: Friday, January 20, 2017
**RE: Sharon Walker ID: 50500931**

Please be advised that **Sharon Walker** is a student with a disability who is enrolled in your class for the Spring 2017 academic tern
academic adjustment(s) in the classroom.

**Specific accommodations the student is eligible to receive:**

1. **Alternative Testing**

   ◦ **Extra Time 1.50x**
     Student is eligible for up to time and a half for testing.

2. **Classroom Access/Accommodations**

   • Assignments should be specific and given in writing
   ◦ **Modify assignments due to disability**
     Student may need to have assignments or testing modified due to disability. Please contact our office for assistance.

**Additional Notification(s):**

1. Extension on Assignments up to 1-2 days

Please note that the recommended academic adjustments could comprise an incomplete list. Accommodation needs can change o'
adjustments for the student, please visit with me as soon as possible to discuss possible solutions.

"Students who require academic adjustments in the classroom due to a disability must first register with A-STATE Disability Service
Appropriate arrangements can be made to ensure equal access to this course."

The confidentiality protocol between A-STATE and the student with a disability requires absolute privacy of the student's evaluation
course.

**Important Links:** Faculty Resources for Accommodating Students with Disabilities
http://www.astate.edu/a/disability/faculty-resources, http://www.washington.edu/doit/Faculty


EXHIBIT
A

CATHOLIC HEALTH
INITIATIVES

# St. Vincent Family Clinic

**FAMILY PRACTICE**

William H. Riley Jr., M.D.
Forrest H. Miller, M.D.
Charles H. Rodgers, M.D.
Daniel C. Dillard, M.D.
Robert B. Casper, M.D.
Ralph F. Joseph, M.D.
R. Jeffrey Eisenach, M.D.
William L. Joseph, M.D.
Gil Foster, M.D.
Steve Simpson, M.D.
Keith Cooper, M.D.
Michael Stout, M.D.
Katherine Mitchell, MD
Robin J. Perry, M.D.
Srinivasan Ramaswamy, M.D.
Kara Cooper, M.D.
Camille Braswell, M.D.

**INTERNAL MEDICINE**

**Gastroenterology**
Duane Velez, M.D.

**URGENT CARE**
Susan Ebel, M.D.

**RADIOLOGY**
Radiology Associates, P.A.

**PEDIATRICS**
Vince Calderon, M.D.
Mitzi Washington, M.D.
Laura Williams, M.D.
Brad Kaemmerling, M.D.
Rachel White, M.D.

**DIETARY**
Julia Brooks, R.D.

**CLINIC DIRECTOR**
Judy A. Baker

February 22, 2014
WALKER, SHARON K
DOB:1/9/1967

To Whomsoever it may concern:
I have been seeing Ms. Walker for several years now. She has history of hypertension, on diuretics.
She needs extra time everyday, to use bathroom frequently.
For any questions, please contact our office.

Thank you,

Dr. Ramaswamy



'iew Logs

| | Location | Applied Date | Status |
|---|---|---|---|
| 2010 School Year) | JACKSONVILLE MIDDLE SCHOOL | 07/07/2009 | Closed |
| )) | MAUMELLE MIDDLE SCHOOL | 05/13/2009 | Closed |
| | ROBINSON MIDDLE | 05/13/2009 | Closed |
| | STAR ACADEMY | 07/07/2009 | Closed |
| | SYLVAN HILLS MIDDLE | 06/23/2015 | Active |
| | ROBINSON MIDDLE | 06/15/2015 | Active |
| | MILLS HIGH | 06/15/2015 | Closed |



PLAINTIFF'S
EXHIBIT
_D_

Re: Americans with Disabilities Employees Forms                                          7/8/15 7:07 AM

**From:** BREWER, PAUL <pbrewer@pcssd.org>
   **To:** skwalkie <skwalkie@aol.com>; JERRY GUESS <jguess@pcssd.org>; LAURA BEDNAR <lbednar@pcssd.org>; SHAWN BURGESS <sburgess@pcssd.org>
**Subject:** Re: Americans with Disabilities Employees Forms
   **Date:** Tue, Jul 7, 2015 2:48 pm

As I stated in our phone conversation on Monday, July 6, 2015, Dr. Guess has agreed to place you in the Business Education position for 190 days at North Pulaski High School for the 20-15-16 school year. The letter from Dr. Patrica Griffith stated that she recommends you be placed in a Business position. We need to know if you plan to accept the business position at North Pulaski or remain in a math position in the district for the 2015-16 school term. Due to planning for the 20015-16, it is imperative that you let me know so we can make staffing plans to fill the open positions for the upcoming school year. As you probably know, every employee has a one year contract, so we cannot offer you a two year contract to include the 2016-17 school year. Everyone in the district will be hired for 2016-17 based on their performance in the 2015-16 school term.

Paul Brewer
Chief Executive Officer/Human Resourses
501-234-2032

On Tue, Jul 7, 2015 at 11:06 AM, skwalkie@aol.com <skwalkie@aol.com> wrote:
   Good morning Mr. Brewer:

   I would like to know if Pulaski County Special School District have the Americans with Disabilities Act Employees Accommodation forms? If so, please advise me with the accommodations set forth for me by PCSSD, according to my doctor's letter dated June 10, 2015.

   Sincerely,

   Sharon Walker



PLAINTIFF'S EXHIBIT

E

**AUSTIN PORTER JR.**
Attorney at Law

**PORTER LAW FIRM**
The Tower Building
323 Center Street, Suite 1035
Little Rock, Arkansas 72201
E-mail: Aporte5640@aol.com

Telephone (501) 244-8200
Facsimile (501) 372-5567

August 17, 2015

**Sent *via* Certified Mail**
**Return Receipt Requested**
**Parcel No. 7014 1820 0001 9365 1480**

Paul Brewer
Chief Executive Officer
Pulaski County Special School District
925 East Dixon Road
Little Rock, Arkansas 72216-8601



**PLAINTIFF'S EXHIBIT**
F

Re: Sharon Walker

Dear Mr. Brewer:

Please be advised that I have been retained to represent Sharon Walker. It is my understanding that Ms. Walker is employed by the Pulaski County Special School District in the capacity as a business education teacher. Ms. Walker has been an education teacher for thirteen (13) years, and has been with your district for approximately ten (10) years. Ms. Walker advised that you wanted her to teach three (3) double blocks of Algebra 1, consisting of 500 minutes weekly per student. As you know, Ms. Walker is currently under the doctor's care for stress relate issues, as well as depression. Ms. Walker's physician Patricia L. Griffen, Ph.D., sent you a letter dated June 10, 2015, asking that you provide a reasonable accommodation, by allowing her to teach one of the available three (3) business classes, but you refused to make an accommodation.

I am in receipt of your letter dated August 13, 2015. Although you offered Ms. Walker a position with North Pulaski High School (which will be taken over by the newly established Jacksonville/North Pulaski School District), she was informed that her job would only last for one year, and that teachers would then be asked to reapply. Placing Ms. Walker in such a position, would only add additional stress and anxiety, which her doctors are currently treating her for. Therefore, such an accommodation, was not reasonable in light of Ms. Walker's condition. Ms. Walker has advised you that she is ready and willing to return to the Pulaski County Special School

Mr. Brewer
August 17, 2015
Page 2

District, teaching a business education class. Again, I am advising you that Ms. Walker is ready and willing to return to the Pulaski County Special School District, teaching a business education class, which she had previously taught for the past ten (10) years.

Ms. Walker is not resigning her position, just to be clear, but is ready to return to work. Again, I am asking that you accommodate Ms. Walker by placing her in a business education class with the Pulaski County Special School District.

Should you have any questions or concerns regarding this matter, please do to hesitate to give me a call. I look forward to hear from you in reference to this matter.

Sincerely,

Austin Porter Jr.
Attorney at Law

/apj