IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

_____

SHARON K. WALKER                                PLAINTIFF

VS.                          CASE NO.:  4:15-CV-00695-SWW

PULASKI COUNTY SPECIAL SCHOOL DISTRICT,
A Public Body Corporate                         DEFENDANT

_____


ORAL DEPOSITION OF SHARON K. WALKER

December 15, 2016

_____

⎤ CC Y

BUSHMAN COURT REPORTING
620 West Third, Suite 302
Little Rock, Arkansas   72201
501.372.5115

PLAINTIFF'S
EXHIBIT
A

BUSHMAN COURT REPORTING

where her mail and everything comes to is the home address.

Q.    Okay, great.  Now, what does she do?

A.    She's working with Little Rock School District.

Q.    What is her title there?

A.    I believe a parapro.

Q.    Does she go to Little Rock schools?

A.    She did.

Q.    Where were you born, ma'am?

A.    I was born in Little Rock.

Q.    1967; correct?

A.    Yes.

Q.    Did you attend Little Rock schools?

A.    No.

Q.    Your family moved?

A.    Well, I was born in Little Rock.  I was raised in Carlisle, Arkansas.

Q.    Is that where you attended schools?

A.    Yes.

Q.    Graduated from Carlisle?

A.    Yes.

Q.    What year was that?

A.    1985.

Q.    Do you know a Rick Vaughn (phonetic)?

A.    Rick?

have towards your EDS?

A.    Zero.

Q.    Zero?

A.    Uh-huh.

Q.    So you've got a few semesters to go?

A.    Right.  I still had 18 more hours in the Master's in Special Ed, so.

Q.    So do you plan, as we sit here today, to complete that program?

A.    Well, I don't have a choice.  I had to take a job as a Special Ed teacher, and I'm on additional license plan.

Q.    Right.

A.    So I had to go back to school to get certified in Special Ed.

Q.    So you're on the three year ALP program?

A.    That's correct.

Q.    And that began in --

A.    February of 2016.

Q.    -- 2016?

A.    Yes.

Q.    So you need to have your certification in Special Ed completed by no later than February of 2019?

A.    Correct.

A. Yes.

Q. What was the reason for your husband's move, work?

A. Yes.

Q. Did he take a government job there?

A. No.

Q. What job did he take?

A. He was working with Martin Luther King, III. I can't think of the name of the organization.

MR. PORTER: King Commission? I'm not sure.

Q. How long were you in Georgia?

A. I think two years.

Q. Did you teach when you were there?

A. Yes, uh-huh.

Q. Where did you teach?

A. Atlanta Public Schools, North -- I just went blank.

Q. On what?

A. Northside. I can't think of the --

Q. So Atlanta Public Schools?

A. Yes.

Q. Northside High School?

A. I think so. Atlanta -- oh my gosh. I forgot the name of the school.

Q.    That happens.

A.    North Atlanta High School.

Q.    Northside?

A.    North Atlanta.

Q.    Were you a math teacher there?

A.    No, no, business.

Q.    Business.  Okay.  Let me ask you about your work history; okay?  So when you graduated Philander Smith in 1993, did you begin your teaching career then?

A.    No.  I worked Pulaski County Juvenile Court.

Q.    All right.  Yeah, I'm looking on page nine.  So you worked for the Pulaski County Juvenile Justice Center?

A.    Yes.

Q.    What did you do there?

A.    Case coordinator for Judge Branton.

Q.    Branton?

A.    Yes.

Q.    Any other jobs in that six-year period between 1993 and 1999?

A.    No.

Q.    That was a full-time job?

A.    Yes.

Q.    County; correct?

A.    Yes.

Q.    All right.  Why did you leave there in 1999?

A.    I decided to do teaching in business.  I got certified.

Q.    Because when you graduated Philander Smith you didn't have a teaching certificate at that time?

A.    No.

Q.    You had a business degree?

A.    Yes.

Q.    And so you were hired with the Little Rock School District?

A.    That's correct.

Q.    And you weren't a certified teacher at that point?

A.    Yes, I had a license, a provisional license.

Q.    Okay.  And I think I know how that works mostly, but you get a job with the provisional license, and then you have to do, or take some type of courses to get the full license?

A.    Well, back then you could take the courses.  I passed the test, so I didn't have to take it.

Q.    So you got the provisional license until you were able to pass the practice; is that what it's called?

A.    Right, uh-huh, and I got that.

Q.    What did you teach in Little Rock School District from 2000 to 2002?

A.    Business, business education courses.

Q.    What grade levels?

A.    High school and middle school.

Q.    Was the curriculum that you taught in that timeframe similar to the business course curriculum when you were at Pulaski County?

A.    I would say yes.  If you're teaching keyboard, and keyboarding is keyboarding.  So, I don't recall -- I think I was teaching keyboarding in Little Rock at the time, and keyboarding in the County.  I was teaching that when I started.

Q.    So let me break that down.  You were teaching keyboarding?

A.    Uh-huh.

Q.    This is at Little Rock; correct?

A.    Yes.  I mean, it was so long ago, yes.

Q.    And I remember keyboarding vaguely, but that's where you are actually teaching the kids the QWERTY keyboard method on how to type?

A.    Yes, yes.

Q.    And is that instructional based as well as or hands-on training at the computers?

A.    Yes, uh-huh.

following your graduation from Philander Smith was with the Atlanta Public Schools?

A.    Yes.

Q.    January of 2002 through May of 2003?

A.    I think so, yes.

Q.    And I'm just going off of that, your interrogatories there.

A.    Uh-huh.

Q.    What did you teach there?

A.    Business.  I don't even -- travel and tourism, and keyboarding.

Q.    That's interesting, travel and tourism under business.  What, what does that course look like?  Just kind of briefly describe that for me.

A.    They had their own software, and it was more like hospitality.  They were gearing students if they didn't want to go to college they would learn how to work at a travel agency, a hotel, just the different...

Q.    All right.  And then you returned to Arkansas after Atlanta, after your stint with the Atlanta Public Schools?

A.    Yes.

Q.    And I see here that you went to work for Little Rock School District?

Q.   Because you were in ALE when you made the transfer?

A.   Uh-huh, yes.

Q.   And so you chose, voluntarily chose to go to Maumelle?

A.   Well, yeah, they asked me which school, yes, uh-huh.

Q.   So were they phasing out ALE at Mills completely?

A.   It wasn't at Mills.  It was -- the County had their own ALE school.  It was behind Fuller Elementary.

Q.   Okay.  Over by Mills?

A.   Uh-huh.

Q.   Well, I misunderstood.  I thought you were at Mills until you were --

A.   I was.  I was at Mills, and then I went to the ALE because enrollment dropped.  And when you lose students, then they have to lose faculty, and so I went to the ALE.

Q.   Was that still considered part of Mills?

A.   No.  It's part of the County.

Q.   Okay.  So really you did a progression of Mills.  Then you went to the ALE?

A.   Uh-huh.

if I did keyboarding or I was doing a math, and so they were on the computer.

Q.    Okay.

A.    And they just did that.  So I wanted to be in a regular school environment that offered, you know, the traditional school.

Q.    So were you at the Little Rock's ALE campus or ALE building?

A.    Yes, but it was in east -- is it East End?

Q.    East End, the community?

A.    Uh-huh, the old.

Q.    East End, is that, that's like near Sheridan?

MR. PORTER:  Are you talking about Carver, East End, Little Rock?

MR. KEES:  Okay.

THE WITNESS:  Yeah.

MR. KEES:  Oh, that way?

MR. PORTER:  East Little Rock.

MR. KEES:  Gotcha.

BY MR. KEES:

Q.    So let's talk about PCSSD.  What was the first job you took there?

A.    At Mills.

Q.    How long were you at Mills?

A.    Until I went to Maumelle.  I don't know,

it Hallen or Holland?  How are you saying it, Hallen?

A.    Hallen.

Q.    Hallen, is that in West Little Rock, the gated community?

A.    Yes.

Q.    Okay.  I know folks that live out there.  Okay. So Maumelle, and where else -- in and around 2011?

A.    Yes.

Q.    Fall of 2011?

A.    I was teaching Algebra II, and, actually, I guess, from -- I moved there September/October when they decided to, I guess, close the ALE.  So I taught Algebra II from September through December.

Q.    Of 2011?

A.    Yes.  And in January I was in an accident, so I was off the remaining of the year.

Q.    So through, roughly, July?

A.    Yes, that's correct.

Q.    An automobile accident?

A.    Yes.

Q.    Were you injured?  Obviously you were injured?

A.    Yes.

Q.    Did you have to have surgery?

A.    No.

Q.    So did you take your FMLA leave?

A.    The second period they gave me ALE.

Q.    Okay.

A.    And I didn't get my schedule like normally late April, early -- well, May they do your schedule, and, I mean, it has been traditionally up until the last two years that I worked for the County you would know your class, what you're teaching the following year.

This particular year on this schedule it was three or four other teachers and myself.  The board was not complete, so I went to a training July there at Maumelle High School, late July.

Q.    Of 2014?

A.    Uh-huh, early August.  I can't remember the date.  But when I logged in the computer, we were doing some kind of computer training, and I found my schedule.  But second period, it wasn't -- I never had a conversation with Ms. Ireland about teaching a college class --

Q.    Okay.

A.    -- or anything about math.  And it was the ALE that was housed -- they moved them in the school. They had me teaching Algebra I, Algebra II, and geometry.  And they had a fourth math on there during a 50-minute block period.

It's also my economics and Business Law I

and II.  So Ms. Guthrie stated that there was no grading of papers or doing any work.  It was computer-based, but they had no computers to work with.

Q.    What are we talking about, Algebra I?

A.    Well, all of it.  It was Algebra I, II, geometry.  There were no books.  I had to try to find coursework.  I had to grade papers, as well as do the economics and Business Law I and II.

Q.    Okay.  Let's see this back.

A.    So that's just incorrect.

Q.    So what was -- what do you recall it being?

A.    Well, we never had a conversation about me teaching math for starters.  I didn't even know until I went to the training about that math.

Q.    Okay.  When do you recall getting your schedule?

A.    They never sent me anything.  I went to a training there at the school, like I said --

Q.    In the summer of 2014?

A.    When -- yeah, right there.

Q.    Prior to 2014 school year?

A.    Uh-huh.  It was, I want to say, July or August. It was right before school started, and -- I just -- that schedule -- I mean, I guess --

Q.    Well, that's why I pulled it back because it's my notes, so.

A.    Oh right, I understand, but the conversation, I mean, I had five -- I had five preps I had to do.

Q.    You're talking about preparing for a class?

A.    Yes.

Q.    Okay.

A.    Yes.

Q.    So let me ask this, to the best of your recollection, because you taught -- you were teaching for at least a semester before you went on leave -- well, I think we will go over it, but I think you went on leave in December?

A.    Yes.

Q.    So at least four months.  What do you remember teaching?

A.    I taught economics.  Then I went to the ALE. And I had to teach Algebra I, Algebra II and geometry.  There was no computers in there.  There was no books, no guidance, nothing.

Q.    For Algebra I, Algebra --

A.    Algebra II, and Algebra III.

Q.    Okay.

A.    I mean, no, geometry.  There were three maths during a 50-minute class period.

Q.    Well, they were different class periods?

A.    No, no, they were all -- all of them was in one class period, 50 minutes.  All of that in second period.

Q.    Algebra I, II?

A.    And geometry.  It was supposed to have been a computer-based, but the district didn't get the program -- I mean...

Q.    Didn't get the program?

A.    They didn't get it up and running -- I don't think -- until November.  I mean, I can't -- I don't --

Q.    So do you remember teaching business law?

A.    I did.  I went back in third and fourth.  I don't remember which order, but after I left there third period, I had a business law class, or maybe economics.

And then I had a fourth period business law, economics.  I don't remember the exact schedule, but yes, I taught five preps.

Q.    Okay.  So let's talk about -- and preps is separate from periods; right?  When you say "preps," you're meaning preparing for class?

A.    The class, yes, uh-huh.

Q.    Okay.  So there was going to be one period that

had a combination of Algebra I, II, and geometry?

A.    Uh-huh.

Q.    And did you split the class into, like, 15-minute increments, or was it all taught together in some way?

A.    Well, I didn't have any -- I asked for guidance.  I mean, I got worksheets and tried to split it and work with the students, I mean.

Q.    And did they -- did that period change?

A.    No.

Q.    Okay.  So you had that class for the whole semester?

A.    The entire year, yes.

Q.    The entire year?

A.    Yes.

Q.    But you taught it for the entire semester?

A.    Yes.

Q.    Okay.  So on this that I was showing you, it had business law first period.  Do you think that's accurate?

A.    Uh-huh.

            MR. PORTER:  You need to say "yes."

A.    Yes.  I'm sorry.

Q.    And then it had second period as the Algebra I?

A.    Algebra II, and geometry.

Q.    Okay.

A.    So it wasn't just one.

Q.    All right.  So it was my error on that.  I don't know school like you do.  That was the algebra -- what did you call that class period?

A.    ALE, alternative learning.

Q.    Oh, okay.  So it was ALE, but they --

A.    Housed in the school.

Q.    Gotcha.

A.    Uh-huh.

Q.    And then it's got third period economics?

A.    Yes.

Q.    And then fourth period business law?

A.    Correct.

Q.    Is that the same business law --

A.    Uh-huh.

Q.    -- that you had taught prior?

A.    Uh-huh.

Q.    And was the economics the same that you had taught --

A.    Yes.

Q.    -- previously?  And then it shows fifth period economics again?

A.    Yes.

Q.    And that's the same coursework as your third

period economics --

A.    Yes.

Q.    -- correct?  And then sixth was your conference period; correct?

A.    Correct.

Q.    And then seventh was economics?

A.    Correct.

Q.    And those -- so you had economics, according to this, and your testimony, third, fifth, and seventh periods?

A.    Correct.

Q.    And that's the same coursework, just different students?

A.    Correct.

Q.    So was the only thing new that year this second period component, which is the ALE Algebra I, II, and Geometry III?

A.    Yes.

Q.    That was the new 50-minute period?

A.    Yes.

Q.    Correct?

A.    Uh-huh.

Q.    Now, why did you have to prep for three classes within that one period?  What does that mean?

A.    Algebra I is a class.  Algebra II is a class,

and geometry is a class.

Q.    Now, in the ALE are you teaching them in the traditional method that we have been talking about where --

A.    Well, I didn't have a choice, because they didn't have a computer program set up --

Q.    Okay.

A.    -- so I had to -- but it was a behavior, and it was chaotic because they fought. They cursed. It was, it was -- I don't even know how to -- it was a traumatizing experience.

Q.    To be -- during that one, that one period?

A.    That -- yes.

Q.    Now I will ask you a question. You were at Maumelle, but then you went to the ALE?

A.    I left the ALE, but the one I taught, actually, in Little Rock, it was structured. It had, it had -- I mean, maybe -- it had structure, and this -- they didn't have anything. They didn't have any books.
        You know, I would get a work sheet, and I would try to work with them, but the behavior, it was...

Q.    But I thought ALE was at a different location?

A.    Remember, they phased out the -- they were phasing it out, and they were housing all of them in

the school.

So the schools had to keep their ALE there instead of sending them to a central location where all of them -- it was supposed to have been cheaper for the district or whatever.

Q.    So you had all of your classes in the same classroom, except ALE, where you went to the ALE classroom?

A.    That's correct.

Q.    And then third, fourth, fifth, sixth is your conference. Seventh is another class. You could stay in your one classroom?

A.    That's correct.

Q.    So is it true the only substantive course change in 2014-15 was the addition of the second period ALE class?

A.    That's correct.

Q.    Now -- and you've said that you were told that there was supposed to be a computer program, and it hadn't arrived?

A.    That's correct.

Q.    Would -- would administering that class on the computers have been better?

A.    I don't think so. I mean, the students were not on grade level, none of the students. The

behavior issues, it was off the chart.

I was told it would be another teacher with me, but the teacher had -- planning in there with me. The ALE teacher had planning during second period, so I was in there by myself.

And they got a parapro, and then we had a lot of Special Ed students in there, so they had a Special Ed teacher to come, but it was -- it was just wild.

It was -- the behavior was not -- it wasn't a learning environment, conducive to learning. It wasn't an environment conducive to learning because of the behavior issues in there. There was either a fight every day, or profanity, or it was just chaotic.

Q.   Now, how many students were in this ALE classroom?

A.   Oh, I don't want to tell a story. I want to say maybe 12 or 15, I mean.

Q.   Well, I understand maybe you don't -- I was trying to get a good ballpark.

A.   Okay.

Q.   Would 12 to 15 be accurate?

A.   I think so. I don't recall, but it was some serious behavior issues, like fighting.

Q.    Right.  Well, I'm not going to try to get, I'm going to try to get a good understanding of the numbers.  There certainly wouldn't have been more than 20?

A.    No, no, no.

Q.    Okay.  So 12 to 15 is a good estimate of how many students were in there?

A.    I think so.

Q.    And then it was you -- you were the lead teacher?

A.    Uh-huh, yes.

Q.    Were you the only certified teacher during that period?

A.    They brought in, eventually brought in a Special Ed teacher, because I had a lot of Special Ed students in there.

Q.    Okay.

A.    After, you know, requesting and saying I need help, I had --

Q.    When did the Special Ed teacher arrive?

A.    I have no clue.  That was so traumatic and traumatizing to me, I have no clue.

Q.    And then you had a para for Special Ed students?

A.    No.  I think they were supposed -- they

initially didn't have anyone in there, and I think eventually towards maybe October, late October, November they were trying to hire someone.

They would get a sub. They would call in a sub because when I went to a training they were saying that it should have been an assistant in there, so I was asking, Where is the assistant. So I don't want to have it inaccurate.

Q.    I thought I heard you say earlier there was a para, though?

A.    Well, it was a -- they were supposed to hire a para for that, and so they were getting a sub every day until they got a para.

Q.    Okay.

A.    And then towards the end I think they did get someone right before Christmas, but they were calling in a sub.

Q.    So was there a para in there when you first started in August?

A.    No, I don't think so.  No.

Q.    So are you saying it was just you at one point?

A.    Yes.

Q.    And then subsequently they added a Special Ed certified teacher; correct?

A.    Yes.  They pulled someone from the -- she would

by my house, and I was taking some apple cider vinegar for weight loss. And so I drank some of that, because I read that that was good for blood pressure, and I went to my doctor, and it was still up, 170-something.

So I didn't have a history of high blood pressure and had no stresses at home, and he said, you know, What's going on? And I told him, Work.

And so he put me on a fluid pill, Triamterene, and he said it would help calm me down and ease my -- so as the year progressed, with Ms. Guthrie moving me, like I said, in the box.

Q. Are we talking about 2013 and '14, the year prior to your leave?

A. Yes, uh-huh.

Q. I didn't mean to interrupt.

A. Oh, no worries.

Q. Were you -- you were finishing a statement there, something about as things continued with Ms. Guthrie?

A. Yes. So, you know, we did like a 30-day trial to see. You know, I went back, and the day I believe I went back, my pressure was sky high.

She had moved me in a room similar to maybe this. It was no SMART Board. It was isolated. It

wasn't close to a restroom.

And my doctor had given me an accommodation letter, and I met with her, was taking a fluid pill. You know, some days you may go to the bathroom 20 times; some days you may go 10.

It just varies. So I needed an accommodation, and I needed to be next to a teacher next door, so whenever I had to go, I could go, instead of waiting for security or whatever.

So I provided my accommodation letter. I talked to her, and I was -- you know, she would just begin moving me around.

And she moved me again down -- I didn't teach ninth graders, but she put me with ninth graders. I was teaching eleventh and twelfth graders.

Q. Now, going back to this classroom, were you there -- did she move you after you made these, this accommodation known to her?

A. Well, this right here, my accommodations was prior to that, yes.

Q. Right.

A. Yeah, so she was still moving me and doing stuff to me. That's why I said it was retaliatory.

Q. Well, when you were in this classroom, that was

not close to a bathroom?

A.    I didn't go because she said, Well, someone has to go.  If you're not going to go, who is going to go?  I don't know.

Q.    Go where?

A.    In that room, but no one went in the room.  I'm the only person that she assigned that box to, and she didn't assign it to anyone else.

She didn't email them.  She didn't ask.  I'm the only person.  So she moved me to another classroom.

Q.    So you were actually never in that classroom?

A.    Well, because I appealed it, and I -- you know, there is no -- you are violating my accommodation.  I have to be next to a restroom.  You know, there is no one close by.  If I have to go to the restroom, what am I going to do, use it on myself?

Q.    Well, I'm just saying --

A.    No, that's why --

Q.    -- she never did move you to this classroom we were talking about?

A.    Well, no, because I contacted Dr. Warren then, no.  I mean, no one else was moved or given a box.

Q.    Well, and to be accurate, you were never put in this classroom?  It was suggested that you move

A.    No, I didn't.

Q.    Okay.  So what other issues were you --

A.    About --

Q.    -- about the retaliation?

A.    So the following year, the following year, the last year I was there she moved me down to the ninth graders.  I don't teach ninth graders, the ninth grade hall, and she moved me a room --

Q.    You were to teach ninth graders, or that you were moved to the ninth grade hall?

A.    Ninth grade hall.

Q.    But still teaching the same students?

A.    Yes.  So the room that she moved me to was, like -- it's a whole row of lockers, and back in a cubby corner is a classroom.

So, again, we had to go through the emails and the meetings, and Dr. Warren, and even so much as I was going to seek legal advice, because I have the same issue.  I need to be close to a person and a bathroom.

And she was like well -- she wouldn't reply.  I kept emailing.  Maybe after the fourth or fifth email she said, Well, we walked -- she called me in and said, We walked.  Your current bathroom is 30 steps, and the new bathroom is 48 steps.  Who does

were on FMLA leave?

A.    No.   I think the board meeting went long again, and so by the third one I was on --

Q.    So you never had a level three grievance meeting?

A.    No, I did not.

Q.    Okay.  Let's talk -- shift a little bit and talk about the medical.  Basically tell me all of the medical issues you relate to having to go on FMLA leave in December of 2014.

A.    I guess from that schedule I began not sleeping, worrying, anxiety, stress, and my husband said, you know, You really need to go and get checked and see what's going on, because we don't have any issues at home.  So I just found it got to the point I was just constantly crying and couldn't get it together.

Q.    What is the time period around this?

A.    I guess it started in September or October.  I can't give you a date, but --

Q.    Are we talking September or somewhere around 2014?

A.    That year, yes.

Q.    Now prior to that, had you ever seen a medical physician or medical professional regarding anxiety,

A.    Yes.

Q.    I am just trying to get --

A.    Yes, my blood pressure, yes, had started going up, yes.

Q.    Okay.

A.    But he diagnosed it as work-related stress.

Q.    So prior to September of 2014, you had seen a doctor regarding high blood pressure?

A.    Uh-huh.

Q.    Was that, I mean, like a year before?

A.    Yes.

Q.    What was the doctor's name?

A.    Ramaswamy.

Q.    And that was you said Ms. Guthrie, but to narrow it, it was the issue with moving your classes, classrooms?

A.    No, it was just -- you know, it was -- I really didn't keep a count of the stuff that was going on until it became significant.  It was just other different things she was doing.

      I didn't email anyone about it.  Like, for instance, if I would write students up, I emailed her, because she would call me in when I would write the white students up.

      So I said, Well, I noticed that you have a

I've got your emails here, and I gave your attorney a copy. The first one, and I just probably should put these in chronological order. I've got December 30th.

MR. KEES: Do you want that copy, or do you need to look at this one?

MR. PORTER: I'll look at these.

BY MR. KEES:

Q. And that's to Ms. Ireland. That's your assistant principal; right?

A. Uh-huh.

MR. PORTER: Say "Yes."

A. Yes.

MR. KEES: Okay. This will be Exhibit 1.

(Exhibit No. 1 was marked.)

BY MR. KEES:

Q. Okay. And so December 30th, that's actually the date I had down that you took FMLA leave. Does that sound correct?

A. Yes.

Q. What doctor are you treating with there?

A. Nayles.

Q. Okay. Your primary care physician?

A. Yeah, because it was Christmas break, and I was

Q.    Okay.  And then here you're asking for an extension of FMLA?

A.    Correct.

Q.    And you tell him that you have a follow-up appointment April 22nd?

A.    Yes.

Q.    And I don't know if I have a response here, but I'm assuming that was granted, because you did remain on FMLA leave; correct?

A.    Yes, uh-huh.

Q.    There is no dispute that you were on FMLA leave through the rest of that school year, 2014-'15?

A.    That's correct.

Q.    Okay.  And then your -- that was March 25th, 2015, and then the next email I have is April 22nd. And that's to Ms. Ireland, and you're saying that you're still on leave, and you will be reevaluated on May 13th?

A.    Yes.

Q.    And then the next one is indeed May 13th, right on the dot, so you had, I'm assuming, saw your doctor.  He extended -- is that Dr. Nayles?

A.    Uh-huh.

Q.    He extended your medical leave, and you told Ms. Ireland and you copied doctor, or Mr. Brewer, and

conversation with Mr. Brewer on the phone. Do you recall that?

A.  We did talk on the phone, yes.

Q.  Okay. Sometime after this email of June 26th?

A.  I -- yes, and I think we have talked previously -- I mean, I had his cell phone number.

Q.  Oh, okay. Oh, you had his cell phone number?

A.  Yes, uh-huh.

Q.  So y'all had an open line of communication?

A.  Yes, uh-huh.

Q.  Now, did you know that he was over Human Resources essentially for the district?

A.  Yes.

Q.  Okay. And what was the understanding around, you know, June when you were talking to him about your disability?

A.  He said wait until the posting -- the school year had just ended, and if they had some business positions that they could move me.

Q.  And at this point in June you are still an employee of the district?

A.  Yes.

Q.  Okay. And he had discussed with you that he would look, or that you should look for the postings on business classes, and then y'all would discuss

that?

A.      Well, he said they would have some openings. You know, people retire at the end of year, and then I could move to a business if there is an opening.

Q.      Now, you were wanting to stay at Maumelle?

A.      No, no, no.  No, no.

Q.      You didn't have a preference?

A.      No.  No.  Anywhere, just in the district.

Q.      Okay.  And then at some point he talked to you about the job at Jacksonville North Pulaski School?

A.      Well, after they filled all the -- you know, Keys (phonetic) had stated that at the end of that year --

Q.      Dr. Key?

A.      I didn't know he was a doctor.

Q.      Oh, okay.  Mr. Key.

A.      Yeah.

Q.      But you're talking about Johnny Key, the commissioner?

A.      Yes, uh-huh.

Q.      Okay.

A.      So, anyway, they had stated that -- he had stated that at the end of the year that the people in Jacksonville would no longer have a job, so --

Q.      At the end of the 2016, or end of 2015-'16

school year?

A.    Right, correct.

Q.    Okay.  Go ahead.

A.    And so I had interviewed for a job, I believe, at Mills.  I applied for Mills, Sylvan Hills.  I wasn't afforded an interview at Sylvan Hills.  I don't know why, but anyway, --

Q.    What is the timeframe on these when you're applying?

A.    Whenever they --

Q.    Around, can we say around the spring of 2015?

A.    No.  It was --

Q.    The end of -- oh, it would have been the end of --

A.    The school year.

Q.    Yeah, around the spring of 2015?

A.    Uh-huh.

Q.    Like April, May, sometime?

A.    No, no.  They were like in June.

Q.    June of 2015?

A.    Uh-huh.

Q.    Okay.  Hold on.

A.    So Dr. Griffin had sent him a letter and stated that I was, I could return in a business position.

Q.    So where did you apply?

A.    They had Mills, Sylvan Hills, Robinson Middle School, North Pulaski.  I didn't apply there.  And I think there was another school in district.  I can't recall.

Q.    Now, the Mills position, what happened there?

A.    I didn't get it.

Q.    Did you interview?

A.    Yes.

Q.    Do you know who did get it?

A.    A lady from Lonoke.

Q.    Do you know her name?

A.    Well, I'm sure if you -- she moved to Maumelle to the position that I previously had, from my understanding.

Q.    So at Sylvan Hills, what happened there?

A.    They didn't even afford me an interview.  Didn't call me.

Q.    Robinson?

A.    I had an interview.

Q.    And you weren't given the job?

A.    No, I wasn't.

Q.    Offered the job?

A.    No.

Q.    Do you know who did?

A.    No, I don't.

Q.    And then North Pulaski?

A.    I didn't apply for that, so after they closed all of the schools in the County that wouldn't be affected by the separation.

      Then that's when he sent me an email and told me, Well, I'll going to place you -- he called me, and then he followed up, I believe, with a -- I followed up one of the emails -- I followed up where the email that I'm going to place you -- I found you a job, North Pulaski.  But that's not giving me a job, because it's only for nine months.

Q.    Well, did you have any reason to believe that you would not be renewed after the detachment?

A.    They had said that on the news.  It was very clear.

Q.    Well, they had to have teachers, though; did they not?

A.    But that's in Jacksonville, that's a whole new district.  I mean, I'm giving up seniority, less pay, and driving to Jacksonville.  So it wasn't a whole -- and I wasn't guaranteed a job.  All of those teachers had to apply.

Q.    To the new Jacksonville North Pulaski School District?

A.    Yes.

insurance, maintain?  And so, no, that, that was a recipe for a heart attack right there.

Q.    Now, did you ever discuss staying at Maumelle and having to keep your past courses?

A.    No.

Q.    You didn't make that request?

A.    No.  I mean -- no.  Are you talking about keep business?

Q.    I am saying go back to Maumelle with the same classes, except for that one period?

A.    No, they never offered me that.  They gave me three Algebra I class, double block, where most teachers teach 50 minutes per day with students, 250 per minutes per week, they gave me a hundred minutes per day with each student, 500 minutes, so that was double.

Q.    That's what they offered you back at Maumelle --

A.    Yes.

Q.    -- because --

A.    They had taken me all of the way out of business and put me in math.  And they gave me, like, the students that failed Algebra I, double block.

Q.    And this was a conversation that you had with who that told you about this offer at Maumelle?

A.     Well, I kept emailing about my schedule in May, and so in June Mr. Brewer, I believe it was him or Ms. Ireland, they gave me all Algebra I classes, double block.

Q.     And you are licensed to teach those classes; correct?

A.     Yes, but it was too stressful.  I mean, the impact was...

Q.     And then this next one is a letter that you're familiar with.  At the end here, Mr. Brewer, does he state, If your doctor says September 3rd, 2015, that you're medically able to work, and you desire to return to work, let me know right away.  I will do my best to find and offer you a position with PCSSD?

A.     Where are you?

Q.     Right there at the bottom paragraph.

A.     Uh-huh.  Well, that's North Pulaski, so that, that wasn't a job.

Q.     Well, I think you're parsing words here, because at that point North Pulaski High School was still part of PCSSD?

A.     It was, but it was only -- even my doctor and Dr. Griffin, I mean, it was too much stress and worry with me counting down every month that, okay, I have eight months left with a job.  I have five, 30 days.

packet, we will get it to you.

MR. KEES:  Okay.  Yeah, if you could just -- any emails she has regarding the --

THE WITNESS:  One we sent Certified.

MR. PORTER:  The letter?

THE WITNESS:  Uh-huh, about, you know, he told me.

MR. PORTER:  I'm sorry.  Go off the record.

MR. KEES:  Off the record.

(Off-the-record discussion)

(Exhibit Nos. 2 and 3 were marked.)

BY MR. KEES:

Q.    So in between then -- oh, strike that.  You then went to work for North Little Rock February of 2016?

A.    Yes.

Q.    What did you do in the interim, the summer of 2015 to February of 2016?

A.    Stayed home.

Q.    Did you do anything for an income?

A.    What do you mean?

Q.    Did you work anywhere?

A.    No, I didn't work.

Q.    Did you work at the family funeral home?

A.    No.

Q.    And then when did you start the job search again?

A.    Actually, the sophomore campus principal, we used to work together, and so he would call and check on me to see how I was doing.

And he said that I think they, something about the days in Special Ed, they needed a certified teacher, and it was a small, real small number of students.

I think I had maybe a total of 16 all year, because their classes are small, and if I could, you know, apply for an ALP and interview for the position, they needed a teacher that would.

And so I did.  And when he would call and check on me, I said, I'm just -- you know, I guess I was getting depressed or really depressed, because I wasn't teaching, which I love doing.  So I applied for the teacher position and interviewed, and I got it.

Q.    At, at North Little Rock?

A.    North Little Rock, uh-huh.

Q.    And it was -- you started in middle of the school year?

A.    Yes.